Page 1

FILED
CLERK, U.S. DISTRICT COURT

APR 2 3 2008

CENTRAL DISTRICT OF CALIFORNIA
BY LAW                    DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HON. CORMAC J. CARNEY, JUDGE PRESIDING

ORIGINAL

```
UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )
                               )
       vs.                     )  NO. SACR 07-227-CJC
                               )
IGOR M. OLENICOFF,             )
              Defendant.       )
_____)
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

MONDAY, APRIL 14, 2008

SENTENCE

Maria Beesley-Dellaneve, CSR 9132
Official Reporter
Ronald Reagan Federal Building
411 W. 4th Street
Room 1-053
Santa Ana, CA   92701
(714) 564-9259

DOCKETED ON CM

APR 2 4 2008

BY LAW             163

```
1    APPEARANCES:

2    FOR THE PLAINTIFF:    THOMAS P. O'BRIEN
                           UNITED STATES ATTORNEY
3                          BY:  BRETT SAGEL
                           ASSISTANT UNITED STATES ATTORNEY
4                          411 W. 4TH STREET, 8TH FLOOR
                           SANTA ANA, CALIFORNIA 92701
5

6

7
     FOR THE DEFENDANT:   HOCHMAN, SALKIN, RETTIG, TOSCHER & PEREZ
8                         By:   EDWARD ROBBINS, ESQ.
                          9150 WILSHIRE BLVD. SUITE 300
9                         BEVERLY HILLS, CALIFORNIA 90212
                          310-281-3200
10                        EDR@TAXLITIGATOR.COM

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

1                SANTA ANA, CALIFORNIA; MONDAY, APRIL 14, 2008

2                                10:00

3                                -oOo-

4          THE CLERK:  Item two, SACR 07-00227-CJC.  USA versus

5     Igor M. Olenicoff.

6          Counsel, please state your appearances for the record.

7          MR. SAGEL:  Good morning, Your Honor.  Brett Sagel on

8     behalf of the United States.

9          THE COURT:  Hello, Mr. Sagel.

10         MR. ROBBINS:  Good morning, Your Honor.  Edward Robbins

11    for Mr. Olenicoff, who is present.

12         THE COURT:  Hello, Mr. Olenicoff; hello, Mr. Robbins.

13    Okay.  We're here for the sentencing of Mr. Olenicoff.

14    Let the record reflect that Joe Abrams from probation is here as

15    well.

16         I have received the presentence investigation report.  I

17    also received the government's position on that presentence

18    investigation report, Mr. Sagel.

19         And then I also received, Mr. Robbins, your concurrence

20    with the recommendation of probation.

21         And Mr. Olenicoff, I did want to let you know I received

22    your binder with all the materials that were there and I went

23    through them thoroughly.

24         Let me first identify what I believe is the applicable

25    advisory guideline range.  I sense that there is no disagreement

Page 4

1    among any of us on what it is, but for the record, the offense

2    level is four, the criminal history category is one.  That leads

3    to a sentencing range of zero to six months of custody time.

4            I then, going through all the materials, have identified

5    several factors under 3553 and some of the objectives of

6    sentencing under 3553 that I think are relevant.  First, the

7    aggravating factors is that we had a repeated false statement

8    about no control over foreign bank accounts.  And it appears that

9    the motive, as best as I can tell, was to reduce tax liability.

10   Although it's not crystal clear to me why someone of Mr.

11   Olenicoff's intelligence would answer a question that seems to be

12   so easily proved to be false would say, "No, I don't have such

13   control."

14           Also, I don't sense he started off this way, but Mr.

15   Olenicoff has a very exceptional lifestyle now; lives very

16   comfortably.  So he isn't an individual that had tremendous

17   hardship or financial motive to do the crime to live.

18           There are, however, I believe, many mitigating factors.

19   If you put this offense aside, one has to be so impressed with Mr.

20   Olenicoff, not only what you have achieved, sir, in your business,

21   which is amazing, but some of the just fabulous, wonderful,

22   wonderful work that you do for children.  I was very moved by it.

23   And I have a suspicion that some of these children that you help,

24   there is probably not a lot of people who wants to help them.  And

25   it's just fabulous work, which almost frustrates me, is because I

Page 5

1    look at someone like you who has been so successful in the

2    business community and done such wonderful work for the community,

3    you are kind of like our heros.  And I want heros in this

4    lifestyle.  So then when I find out that people of your stature

5    and standing, you know, lie on your tax returns, it frustrates me;

6    saddens me.

7           And consistent with that, again, the mitigating is your

8    exemplary community service and your humanitarian causes, and the

9    fact that you are a significant employer; I gathered almost 400

10   employees now in your business.  Those are powerful facts.

11          Looking at the parties's positions, it seems probation

12   and Mr. Olenicoff and Mr. Robbins all believe one year probation

13   is appropriate.  The government, Mr. Sagel, I take it three years

14   probation.

15          Being very candid, and I'm open to hear anything from

16   anybody or any further evidence you want me to consider, I do feel

17   a probationary sentence is appropriate here.  But none of the

18   sentences I feel that are being recommended to me really capture

19   the objective of punishment of 3553.  I don't want to sound like

20   I'm being overly punitive, but I still don't sense that just

21   merely probation is enough punishment, which is one of the

22   objectives of sentencing that I'm trying to achieve here.  I'm not

23   trying to be vindictive, but I have to address that factor.

24          So I was thinking of community service.  Joe Abrams from

25   probation, who I have a tremendous respect for, I know thought

1   about that issue and considered, well, I don't want to divert him

2   from these wonderful causes that he's doing, and I share that

3   concern.  But I guess I come out of it differently.  I believe

4   that someone like Mr. Olenicoff is going to still do those

5   wonderful community service projects and be involved, but I think

6   we could require 120 hours of community service.  And we can talk

7   about the time period, when that has to be done, to make sure that

8   it doesn't interfere with some of his wonderful work he is doing.

9           But that's where I'm leaning now, is, I do feel there

10  has got to be a serious consequence for this offense, and it's not

11  jumping out at me, on the record, that there has been a

12  consequence.  I don't feel jail time is necessary or appropriate

13  here, but I still need a consequence.

14          Mr. Abrams, I'll start off hearing from you.

15          Then Mr. Sagel, I'll hear from you, and I'll turn it

16  over to the defense, Mr. Robbins and Mr. Olenicoff, whatever they

17  want to add and say.

18          MR. ABRAMS:  Thank you, Your Honor.  The probation

19  office submitted a detailed presentence report and letter to the

20  Court, so I don't really have a lot to add to the record beyond

21  what is in those documents.  I'll try and address the specific

22  issues that have been raised.

23          With respect to the term of probation, the three years

24  recommended by the government versus the one year that we have

25  submitted as an appropriate sentence, the factors that we look at,

1    we assess this case objectively as we would with any other lesser-

2    known defendant or less wealthy defendant.  We tried to be focused

3    on the relevant factors under the guidelines under 3553(a).  And

4    when you look at the very low level offense that this is, at least

5    in terms of the guidelines and the very compelling, mitigating

6    factors related to Mr. Olenicoff's personal history and

7    characteristics, really at the end of day, there is little or no

8    risk of recidivism here.  I understand there is a larger back

9    story in terms of his past disputes with the IRS that goes maybe

10   beyond what was charged in this case.  But at this point in time,

11   he has settled all those claims.  He has complied with the

12   numerous obligations under the plea agreement that were set out.

13   And I just don't see that recidivism is an issue here.

14            So when we look al all those factors, the length of

15   community service, three years is the maximum suggested term under

16   the guidelines.  And we felt like there was enough mitigating

17   factors to warrant something less than that.  Whether it's one or

18   two years, I would defer to the Court on the length of probation.

19   We suggested one years but two years would certainly be a

20   reasonable sentence as well.

21            THE COURT:  I know you don't have the full evidentiary

22   record before you, but you probably have more at least heard --

23   and it might be hearsay -- but I know very little about any past

24   disputes that Mr. Olenicoff had with the IRS.  But you understood

25   that there were disputes.  I'm trying to understand why would

1   someone, again, of his intelligence, his amazing talent, make such

2   a statement that's so clearly false.  I'm trying to understand how

3   did this happen.

4           Is there anything that you saw in the past history, the

5   dispute that they had that can help me explain or understand how

6   did this come about?

7           MR. ABRAMS:  I'm, for the most part, in the same

8   position as the Court.  I don't have a lot of information on the

9   past history of Mr. Olenicoff and the IRS.  Based on the way this

10  case was charged and pleaded out in the discovery that was

11  provided to us, it was very limited discussion in terms of

12  anything past the false statements in this case.  But I understand

13  there was a large payment to the IRS and settlement of a civil tax

14  liability.

15          THE COURT:  It was $52 million, I believe.

16          MR. ABRAMS:  So I think just on that information alone

17  there's obviously been some history of disputes.  To what extent

18  and how those were resolved, I cannot begin to tell the Court.

19  And it's very hard to address the issue of why he would make the

20  false statements on the returns that are part of this case.  I

21  don't know.

22          THE COURT:  I noticed on the plea agreement there were

23  several obligations that Mr. Olenicoff undertook.  Some, I guess,

24  you could argue, well, he is just complying with the law.  But

25  there were others that I'm not so sure he had to do, such as the

1    transferring all the money into one account here.  I mean, he

2    normally, I guess, would have the right to keep money overseas.

3    He just has to report it.  But he put it all in this country.  So

4    it's going to be easier to follow, I assume.

5          MR. ABRAMS:  That's correct.  And again, in other tax-

6    related cases that we see, there are a lot of standard obligations

7    that are listed in terms of complying with the tax laws.  But I

8    think this plea agreement went beyond that and included quite a

9    few additional obligations that he apparently has willingly

10   complied with.

11         THE COURT:  Let me ask you a bigger question.  I was --

12   I'm struggling for use of the word -- not surprised, but the

13   offense level was so low, and I know in other contexts, lying to

14   the FBI, for example, the advisory guideline range is much higher,

15   the offense level.  It may be a bad example, but the Scooter Libby

16   case, for example, my recollection of the advisory guideline

17   range, similar criminal history, one, but the time in custody I

18   thought was 18 months to under the range, whereas here it's a

19   very, very low offense level.

20         MR. ABRAMS:  Correct.  And the reason for that is it's a

21   tax case.  And the offense level is largely driven by any tax loss

22   that might be associated with the false statement.  In this case,

23   there was no tax loss for criminal sentencing purposes.  So the

24   offense level remained very low.

25         As far as Scooter Libby goes, I don't know the details

1   of his case.

2               THE COURT:  Nor do I.

3               MR. ABRAMS:  There was an obstruction enhancement, and I

4   think that went to trial so he maybe did not even receive

5   acceptance.  So it's very hard to compare one case to the other.

6   But this case essentially is as low as it is because there was no

7   tax loss.

8               THE COURT:  I'm glad I raised the question.  I know this

9   is distinguishable from a perjury or a false statement to the FBI

10  case.  I was just trying to understand it, and you have explained

11  it to me.  You are saying in tax cases, what really drives the

12  advisory guideline range is the amount of loss and given there was

13  no loss here, that's why it's so low.

14              MR. ABRAMS:  That's correct.  The Court also raised the

15  issue of whether community service would be an appropriate part of

16  the sentence.  This is an issue that I struggled with.  Typically

17  we would be looking for a community service commitment in this

18  type of case where probation is the sentence as a further measure

19  of punishment and deterrence.  But again this is an unusual case

20  in terms of the community involvement that Mr. Olenicoff is

21  already involved in.

22              But I think the Court's point is well taken.  I

23  certainly have no objection to community service if it can be

24  worked out in a reasonable way that would allow him to do both.

25              THE COURT:  Well, I hear you loud and clear.  And not to

1    try to curry your favor, I agree with your concern though, too, is

2    it is wonderful work and I would hate to divert his attention from

3    that wonderful work.  I also don't want to be unfair to Mr.

4    Olenicoff.  In other words, many of the cases where -- I don't

5    want to say white collar crime, but I see individuals who do

6    absolutely nothing to the community, give absolutely nothing back.

7    And I don't want to put them in a better position than I would Mr.

8    Olenicoff who has given to the community, if you follow me.

9            In other words, I don't want it to be a situation, no

10   good deed goes unpunished.  Because you already do a bunch of

11   community service, I'm going to now hammer you on doing even more

12   than you already do.

13           MR. ABRAMS:  Right.  That's the issue that we struggled

14   with and we came out that it wasn't necessary to recommend that,

15   but it was a close issue for us as well.

16           THE COURT:  Okay.  Thank you.  Mr. Sagel?

17           MR. SAGEL:  Thank you, Your Honor.  If I could have one

18   second with Mr. Robbins.

19           THE COURT:  Sure, take your time.

20           (Counsel confer.)

21           MR. SAGEL:  Real quickly, Your Honor, and I'll answer

22   any questions Your Honor has, but I'll comment on what you have

23   raised already with what Mr. Abrams has already talked about.  And

24   let me be very clear before I even make my next comment.  I'm not

25   asking for anything more than probation, but I'm going to make my

1    next comment in response to Mr. Abrams.

2         With the term of probation being up to three years at

3    this level of the guidelines, and when he is talking about, for

4    example, three years being the maximum, well, that takes out of

5    the equation what even in that part of the guidelines, a person

6    could still get six months in jail; could get six months of home

7    confinement; six months in a community halfway house.  We're not

8    asking for these things.  So lengthening the term of probation

9    isn't -- by giving him three years probation, isn't the harshest

10   sentence at that point.  It's actually still lesser, as Your Honor

11   said, any jail time, any other sentencing.

12        So I don't think giving someone three years at that

13   point in probation is the harshest.

14        And in response to the little recidivism and Mr.

15   Olenicoff's complying with all of his obligations, with all due

16   respect for his accomplishments, his deeds and everything else,

17   his complying with his obligations and his doing the right thing

18   right now is only upon the force of the government, the plea

19   agreement, and a felony conviction.

20        He wasn't complying with this for 10-plus years and

21   wasn't doing anything.  It's great that he complied with

22   everything, although he is obligated under the plea agreement.  He

23   did everything he needed to do.  He brought his money back in

24   here, which was an obligation of him.  It means his money can be

25   tracked in the United States.  And presumably if it's in any

1    interest bearing accounts, which I assume they will be, but that's

2    up to him, they'll be taxed in the United States.  So that will

3    further benefit both this government and in following his money,

4    etcetera.

5            The problem is if we make it a one-year probation, 12

6    months and a day from now he can move every one of those assets

7    out of the country again.  Most likely he'll answer the question

8    "yes" from here on out on his tax return, but there is nothing

9    holding his feet to the fire and to make sure that there is no

10   recidivism by giving him only one year probation.

11           So with regard to the second and third year, the

12   government has no problem whatsoever saying it's almost close to

13   no restriction whatsoever.  Travel freely; not have to report to

14   probation, etcetera.  Most of the restrictions that we would place

15   on the first year, I have no problem taking those off the table

16   for year two and three.  I think it's important, however, for this

17   Court and the government to have something over Mr. Olenicoff's

18   actions for two additional years, with very little in the realm of

19   curtailing what he would do in his business, his personal life,

20   etcetera.

21           And if Your Honor is so inclined to implement any kind

22   of community service, depending on what Your Honor was thinking,

23   additional years of probation gives him additional time to comply

24   with that so it wouldn't take away his current community service

25   that he is already doing.  So if Your Honor threw out the number

Page 14

1   120 hours, if you were thinking 120 hours, that gives him three

2   years to comply.  Or maybe you were thinking that per year, I

3   don't know.

4           With regard to community service, obviously you are

5   never going to hear the government say no to that.  I think it's

6   noble and it's good.  And I don't think there is anything wrong

7   with it.  I don't know that it's going to change the situation Mr.

8   Olenicoff faces, but we wouldn't object to it.  And we would defer

9   to the Court on the type, the hours and the period of time.

10          THE COURT:  Okay.  Thank you, Mr. Sagel.

11          MR. SAGEL:  Thank you.

12          THE COURT:  Mr. Robbins.

13          MR. ROBBINS:  Thank you, Your Honor.  Mr. Olenicoff

14   would like to associate himself with the comments and write-up of

15   Mr. Abrams, which we adopt.  We think he nailed it, both in his

16   comments and his write-up.  And we will submit it to Your Honor

17   for a decision.

18          THE COURT:  Okay.  Is there anything Mr. Olenicoff would

19   like to say?  I did receive the binder, like I said, and I have

20   gone through it.

21          But, sir, this is your chance if there is anything you

22   would like to add.

23          THE DEFENDANT:  Thank you, Your Honor.  First, let me

24   maybe respond to your question of why or how I, you know, got

25   here, you know, with this offense.  And it's not to make excuses

1    or not accept the responsibility, because I fully do.  But this

2    goes back to many, many years ago when I clearly got some bad

3    advice and pressure from a lender, to be specific, who needed

4    security and wanted the ownership of the company to be offshore.

5    And if you have a minute, I can explain.

6         When I got started in the business, one of my first

7    banks happened to be a Lloyds Bank of California that has since

8    been acquired by Sanwa.  And at that time I was a preferred

9    customer.  If you can appreciate it, here I am a young man with

10   virtually no assets, but they had about a $44 million unsecured

11   line of credit extended to me that I would borrow and I would then

12   build a project and finance it with an insurance company and pay

13   them back.  And that went on for a number of years.

14        They were then audited by bank examiners.  And the

15   executives that I had been doing business with said, "Gee, the

16   bank examiners asked us if we were sane by lending you $44 million

17   unsecured, and so we have to curtail that.  But we have a solution

18   for you."

19        I said, "Okay, and what is the solution?"

20        Their response was that, "What we can do is lend you the

21   money offshore."

22        At that point my understanding, Your Honor, of offshore,

23   without being funny, was Catalina Island.  So they explained that

24   no, that what they would do is form a company offshore in the

25   Cayman Islands, and that they would want me to get a permit from

1    the state of California and issue the stock of my company to the

2    offshore entity.  And they would lend the money to the offshore

3    entity; the offshore entity would lend it to the onshore entity

4    that I owned.

5              And that all went on.  I said well, that was fine,

6    because it was a means for me to get the liquidity to grow the

7    business.  That all went well.  And about three to four years into

8    it, Lloyds bank was acquired by Sanwa.  Sanwa, although I had a

9    positive relationship with them, said, "Gee, we don't know about

10   the offshore ownership, and we would like to get the debts that

11   they had acquired from the Lloyds bank repaid."  I said that was

12   fine.

13             And it took me about six months.  And I was able to get

14   a very substantial loan of over 200 million at that point from

15   General Electric that encompassed all the debt, that I then repaid

16   Sanwa and repaid a lot of other debts.  At that point, Sanwa said

17   the debt is repaid.  Lloyds bank said, "Thank you very much.  Here

18   is your stock, Mr. Olenicoff."

19             And at that point I was being advised by a very large

20   real estate specific CPA firm to do our taxes.  So I went to them

21   and I said now I can bring the stock back.  This is where the bad

22   advice came in.  They said, "No.  Wait a money.  You don't want to

23   do that.  Keep your stock offshore because if you bring it back,

24   there is a lot of gain in the stock that has grown up in five

25   years and make that your estate plan.  Just keep the ownership

Page 17

1    offshore."

2              That was the bad advice.  So I said okay, fine.  And the

3    ownership remained offshore.  Well, there had been a lot of money

4    that had been earned in the offshore investments.  Now, not making

5    excuses, should I have known better that that income should have

6    been reported here probably two years into it, three years into

7    it?  Yes, Your Honor.  I should have and I did.

8              And so I raised the issue.  I got bad advice again that

9    said, why don't you form a trust offshore and that trust can then

10   hold the stock of your onshore companies.  And for the past 20

11   years, we have been reporting the ownership of Olen as being owned

12   by an offshore entity which is a trust that's a family trust.  And

13   the bank accounts -- again, bad advice but maybe I should have

14   known -- say you don't control those bank accounts.  They will be

15   controlled by a trustee.

16             That's the way we got to where we did.  Had I sat down

17   and thought about it, and I did, and probably would have known

18   that I probably should have checked the box, but I didn't.

19             And so to, you know, to make a long story short, it was

20   bad advice; me not thinking about it.  I'm sorry.  The intent was

21   never to defraud the federal government any -- there has been no

22   personal use of any of those funds offshore, ever.  And the money

23   that was there stayed there and now it's all back here.  It was

24   not for personal gain.  And so again, I apologize.

25             And if I can take another minute of the Court, I fully

Page 18

1   understand your thoughts regarding community service.  I can tell

2   you that I give all the time that I have.  And yes, I can, you

3   know, possibly do more or do something else.  But just as an

4   example, just yesterday in terms of contributions, I contributed

5   three windows for a church; three stained glass windows.  Attended

6   lunch at blind guide dogs -- or Guide Dogs for the Blind; made a

7   contribution there.

8           So I'm continuously involved and it will remain so.  But

9   I hope that answered the question.

10          THE COURT:  You know, it does.  And I appreciate you

11  giving me that background because it makes me feel better about

12  this case, makes me feel better about you.

13          This might seem a little strange, and now it's after the

14  fact, so I don't know if my comments are worth anything, but it's

15  frustrating to me -- and I see this over and over again -- lawyers

16  and accountants complicate the law and strip it of its common

17  sense.  And listening to you, I can't help but feel I understand

18  how you got yourself into this situation.  But then at the end of

19  day, you look at what the question asks you on the tax return, how

20  in the world, you know, could you have answered that "no" when it

21  was "yes."

22          My comment is you are an incredible man.  I got that

23  from the binder on what you have achieved.  You're probably the

24  smartest person in this courtroom.  You have tremendous common

25  sense.  Don't ever lose your common sense.  I'm not saying don't

1   follow the advice of your lawyers and your accountants, but always

2   tell yourself, does this really make sense?

3           THE DEFENDANT:  Thank you.

4           THE COURT:  If I gave you 120 hours community service,

5   I'm not inclined to have it with these wonderful organizations

6   that you're affiliated with.  And what I'm looking for -- I'm

7   careful how I say this, Mr. Olenicoff, because I don't want you to

8   think that I'm downplaying your giving up of your treasure, which

9   is really, really important, but what I want from community

10  service is your time.  Because I think you are an amazing

11  individual; that you have a lot to share with people and the

12  community.

13          That's what I want you to do.  If I gave you 120 hours

14  community service to be performed over two years, would that

15  distract you from these wonderful causes that you have?

16          THE DEFENDANT:  No, Your Honor.

17          THE COURT:  And I do want to commend you.  I just think

18  it's wonderful what you are doing with the orphans in Eastern

19  Europe.  And I think it's wonderful what you are doing with the

20  blind; people who really need the help the most that you are

21  reaching out.  And that's just very genuine.  It really jumps out

22  at me.  I commend you for it.

23          THE DEFENDANT:  Thank you.

24          THE COURT:  Some of those eye conditions, are they

25  strabismus?  A little bit of medical knowledge is dangerous, so I

Page 20

1   don't want to be talking, but I noticed with some of the children,

2   that the corrective eye surgeries that you do, it looked that they

3   were cross-eyed.  Is that strabismus, do you know?

4            THE DEFENDANT:  No.  They're born cross-eyed.  Many of

5   them have surgeries that can be performed here.  We have such

6   generous doctors in the U.S. where you would think that in Eastern

7   Europe or in Russia where they have the ability to perform these

8   operations.  And most of the children that I bring here -- and

9   there's two of them showing up actually tomorrow morning, they are

10  missing limbs.

11           And we have found a clinic in Russia that will perform

12  most of the eye surgeries now.  We have to pay for them because

13  the doctors in the hospital there won't contribute their time,

14  where the doctors here and the Children's Hospital contribute

15  100 percent of the -- so we can do the eye surgeries in Russia,

16  but the limb corrective work is only done here.

17           So we bring them to Children's Hospital and they get

18  prostheses or they get some of the things where the limbs are

19  actually going through their skin and, you know, they need to have

20  some plastic surgery.  There is no two cases that I have seen that

21  are identical.  They're really abandoned kids in orphanages, and

22  they simply sit there and rot unless you are able to do something

23  for them.

24           THE COURT:  That's what is so wonderful.  On the kids

25  with being cross-eyed, I assume if that's not addressed they will

Page 21

1    go blind in one, if not both the eyes; right?

2              THE DEFENDANT:  That's right.  And more than that, it's

3    the ridicule they as kids endure.

4              THE COURT:  Yes.  Do you know if -- and I'm putting them

5    all in one group which probably isn't wise -- but the kids with

6    the deformities as far as the limbs, is that genetic or is that

7    from drug abuse or do you know?

8              THE DEFENDANT:  Well, they're born that way for the most

9    part.  And when they are, they are abandoned by their parents into

10   an orphanage because they simply can't care for them.

11             We did have a boy here who had his legs chopped off

12   because he was playing on a railroad and had a leg chopped off by

13   train.  And so it's a variety of things.  And the parents in

14   Eastern Europe are just strapped for funds to simply survive.  So

15   when they have a child that's born that's either deformed or

16   cross-eyed or, you know, they just abandon them.  And in most

17   cases I find, because I attempt to find their parents, you find

18   that their father is an alcoholic, or their mother has got other

19   problems or other kids at home and they really don't want the

20   kids.  So there is just no way to reunite them.

21             It really goes -- it's actually we help them until

22   they're -- before they're 18.  But once they turn 18, they're put

23   out of the orphanage and the governments have no safety net for

24   them beyond that.  So they really end up out on the streets.  And

25   it's sad to see after the investment that the doctors have made

1   and we have made, but you know, they end up sometimes doing crime.

2   Or think of the worse in our society and that's in their society,

3   and that's where they end up.  They end up in many cases out on

4   the streets.

5            We are able to, once they get a limb, to find them jobs,

6   and some jobs they can do.  And the societies there they, you

7   know, they didn't want disabled people around them.  We're working

8   to change that and accept, say, an elevator operator in a hotel.

9   They still have somebody for the elevator where he maybe has only

10  one arm and the prostheses.  They didn't used to do that.  They

11  have so many people seeking employment, they would rather hire

12  somebody with two good arms.

13           THE COURT:  Well, it's wonderful work.  I commend you

14  for it.

15           THE DEFENDANT:  Thank you.

16           THE COURT:  Mr. Robbins, is there anything else you want

17  to present, sir?

18           MR. ROBBINS:  We'll submit it, Your Honor.  Thank you.

19           THE COURT:  Okay.  I am --

20           MR. SAGEL:  Your Honor?

21           THE COURT:  Yes, Mr. Sagel.

22           MR. SAGEL:  I think Mr. Robbins did have one other

23  request.  I'm just pointing --

24           MR. ROBBINS:  If the Court would include in the sentence

25  that -- assuming we get a probationary sentence.  I don't want to

1    be presumptuous.

2            THE COURT:  No.  My intent is two years probation, 120

3    hours community service to be performed during that two-year.  And

4    hopefully there will be no conflict with that community service

5    and the community service that Mr. Olenicoff is already doing.  I

6    would want that community service to be separate and apart from

7    the wonderful work that he is doing with the organizations that

8    were identified in the binder, but I think they were actually

9    listed in the presentence investigation report.

10           On page 11, paragraph 46, you have Mr. Olenicoff's son,

11   that foundation.  Then University of California Irvine Foundation

12   Cure for Blindness, Health of Fatherland Foundation, which we have

13   been talking about quite a bit this morning, and then Foundation

14   Fighting Blindness.  I would want his time on other worthy causes.

15           MR. ROBBINS:  It will be done, Your Honor.  Mr.

16   Olenicoff has business in Nevada and Florida.  I understand from

17   Mr. Abrams the standard restriction in probation is can't travel

18   outside the district.  If we could modify that to allow travel for

19   business purpose only to Nevada and Florida for Mr. Olenicoff.

20   That way we wouldn't have to run to probation every month and get

21   a special order.

22           THE COURT:  That will be the order of the Court.

23           MR. ROBBINS:  Also, Mr. Olenicoff I think gets his

24   passport back from pretrial who has it now.  And then that his

25   foreign travel will be under the control of probation, obviously,

1   but we're worried about getting our hands back on that passport so

2   it doesn't slip in the cracks somewhere.

3           THE COURT:  I will make that the order of the Court.

4           And just so probation has clear direction from me, Mr.

5   Abrams, make sure they realize Mr. Olenicoff can travel to Eastern

6   Europe to deal with the Fatherland Foundation to the extent that

7   that involves any travel for his community service.

8           MR. ROBBINS:  Thank you, Your Honor.

9           THE COURT:  Okay.  Then I have the recommended sentence

10  from probation in front of me.  That's dated April 14, 2008.  I'm

11  going to make the following modifications:  The term of probation

12  will be two years.  The condition six will be added of 120 hours

13  of community service to be performed during probation.  And that

14  community service again needs to be above and beyond that which

15  Mr. Olenicoff is already performing.

16          Is there any legal cause why I cannot now impose that

17  sentence, Mr. Robbins?

18          MR. ROBBINS:  There is none, Your Honor.

19          MR. SAGEL:  No, Your Honor.

20          THE COURT:  Very well.  It is ordered that the

21  defendant, Igor Olenicoff, shall pay the United States a special

22  assessment of $100, which is due immediately.

23          It is further ordered that he shall pay the United

24  States a total final of $3500 which shall bear interest as

25  provided by law.  The fine shall be paid in full immediately.  He

Page 25

1   shall comply with General Order 01-05.

2           Pursuant to the Sentencing Reform Act of 1984, it is the

3   judgment of the Court that the defendant, Igor Michael Olenicoff,

4   is hereby placed on probation on the single-count information for

5   a term of two years under the following terms and conditions:

6   Number one, he shall comply with the rules and regulations of the

7   U.S. probation office and General Order 318.

8           Number two, he shall cooperate in the collection of a

9   DNA sample from his person.

10          Number three, he shall pay the special assessment and

11  fine in accordance with this judgment's orders pertaining to such

12  payment.

13          Number four, he shall truthfully and timely file and pay

14  taxes owed for the years of conviction and shall truthfully and

15  timely file and pay taxes during the period of community

16  supervision.  Further, he shall show proof to the probation

17  officer of compliance with this order.

18          Number five, he shall not have any interest in,

19  signature authority, or any other authority over a financial

20  account in a foreign country such as a bank account, securities

21  account or other financial account.

22          And finally, number six, he shall perform 120 hours

23  community service above and beyond that community service that he

24  performs each month.  Specifically, I do not want the community

25  service to be for those organizations identified on page 11

Page 26

1    paragraph 46 and page 12 of the presentence investigation report.

2            The drug testing condition mandated by statute is

3    suspended based on the Court's determination that Mr. Olenicoff

4    poses a low risk of future substance abuse.

5            Mr. Olenicoff, there is, I think, just one order of

6    business that I do need to address with you and that, sir, is your

7    right to appeal.

8            MR. ABRAMS:  Excuse me, Your Honor.  May I interject

9    quickly?

10           THE COURT:  Yes.

11           MR. ABRAMS:  On the judgment language, with respect to

12   the travel restrictions that Mr. Olenicoff is going to be relieved

13   from, can the Court state on the record the specific locations

14   that he is allowed to travel to, and also add that he will submit

15   an itinerary prior to leaving for any trip out of the district?

16           THE COURT:  Yes.  Thank you.  And I indicated to Mr.

17   Robbins that was going to be part of the record.

18           So Michelle, if you could make sure it's part of the

19   Judgment and Commitment Order that Mr. Olenicoff be able to travel

20   anywhere in the United States for business.  And I will consider a

21   request if he needs to travel for business internationally.  If he

22   gets with the probation officer and the probation officer agrees

23   with it, fine.  If not, then they need to come to me and I'll make

24   a decision.

25           As far as for pleasure, the travel restriction

Page 27

1    requirements will still apply.  But if there is some sort of

2    special occasion that travel is needed, the probation officer can

3    raise it with me.

4              MR. ABRAMS:  That's the normal process.

5              THE COURT:  Right.  And I also said for purposes of the

6    community service, travel anywhere in this country or

7    internationally is acceptable.

8              MR. ROBBINS:  Mr. Olenicoff will notify probation if he

9    travels outside the district, of course.

10             THE COURT:  Correct.  Correct.  And I think that was

11   what you wanted.  Anything else on that?

12             MR. ABRAMS:  That is all.  Thank you.

13             THE COURT:  Okay.  Mr. Olenicoff, I think then what I

14   wanted to say was your right to appeal.  You may recall from your

15   plea agreement you agreed to waive certain rights to appeal, to go

16   to the Court above me.  Nevertheless, if you feel that that

17   provision is now illegal, unenforceable and you want to challenge

18   it with the court above me, if there is any right that you

19   reserved in your plea agreement that you want to pursue, sir, you

20   have a right to do that and I don't discourage you from doing it.

21             Of course, if you look at the plea agreement, I do

22   believe the government relied on it.  And if you challenge it, I

23   assume the bets are off from the government's standpoint.  But

24   again, that's your decision on what you want to do.

25             THE DEFENDANT:  No, Your Honor.  I have no such

1   intentions.

2            THE COURT:  Okay.  But nevertheless, if you are going to

3   file any appeal, sir, you have to do it that within 10 days of

4   entry of judgment.  So if you file an appeal after that ten-day

5   period, you have blown it.  It won't be considered.

6            Do you have any questions about your right to appeal?

7            THE DEFENDANT:  None, Your Honor.

8            THE COURT:  Is there anything further we need to

9   discuss?

10            MR. SAGEL:  The government would move to exonerate the

11   bond on Mr. Olenicoff.

12            THE COURT:  It will be exonerated.

13            MR. ROBBINS:  Nothing further, Your Honor.

14            THE COURT:  All right.  Thank you.

15            THE DEFENDANT:  Thank you, Your Honor.

16                 (Whereupon the proceedings were adjourned.)

17

18

19

20

21

22

23

24

25

1

2                              -oOo-

3

4                          CERTIFICATE

5

6          I hereby certify that pursuant to Section 753, Title 28,

7    United States Code, the foregoing is a true and correct transcript

8    of the stenographically reported proceedings held in the

9    above-entitled matter.

10

11   Date:  April 23, 2008

12

13

14   MARIA BEESLEY, U.S. COURT REPORTER
     CSR NO. 9132

15

16

17

18

19

20

21

22

23

24

25